IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| Michael Miles Lindsay,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Nichole Francis, Stephanie Schmidt,<br>Daniel Forbes, Franklin Selden,<br>Jane Does 1-3 and John Doe,<br><br>　　　　Defendants. | Case No. 1:19-cv-00029-LTS-KEM<br><br><br>**MEMORANDUM IN SUPPORT<br>OF DEFENDANTS' MOTION<br>FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

I.　　INTRODUCTION..................................................................................................2

II.　　SUMMARY JUDGMENT STANDARD ..............................................................2

III.　　UNDISPUTED MATERIAL FACTS ....................................................................3

IV.　　DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY WERE NOT DELIBERATELY INDIFFERENT TO PLAINTIFF'S SERIOUS MEDICAL NEEDS..................................................................................11

　　　a.　　DEFENDANTS FRANCIS AND SCHMIDT..........................................12

　　　b.　　DEFENDANTS FORBES AND SELDEN...............................................13

V.　　ALTERNATIVELY, DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S DELIBERATE INDIFFERENCE CLAIM...........13

VI.　　CONCLUSION......................................................................................................15

## I. INTRODUCTION

The plaintiff in this matter, Michael Lindsay, was formerly an inmate in the custody and control of the Iowa Department of Corrections (IDOC). The Defendants are all current or former IDOC employees who worked at an IDOC facility where Plaintiff was previously incarcerated—the Iowa Medical and Classification Center (IMCC), in Coralville, Iowa. Plaintiff brings this action pursuant to 42 U.S.C. § 1983, claiming the defendants were deliberately indifferent to Plaintiff's alleged serious medical needs in violation of his rights under the Eighth Amendment to the United States Constitution. Specifically, as set forth in Plaintiff's Amended Complaint, he alleges the Defendants were deliberately indifferent to his diabetes, causing him to suffer a seizure and sustain injuries.

Defendants are entitled to summary judgment because Plaintiff cannot provide any evidence showing they were deliberately indifferent to his alleged serious medical needs. To the contrary, documents provided in support of Defendants' motion for summary judgment—primarily the affidavit of Nichole Francis, A.R.N.P., and relevant excerpts of Plaintiff's medical records—show that the Defendants treated Plaintiff in a manner that was consistent with his rights under the Eighth Amendment. Alternatively, Defendants are entitled to summary judgment because they are entitled to qualified immunity. Either way, this Court should enter summary judgment in Defendants' favor.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990) (*citing* Fed. R. Civ. P.

56(c)). A court considering a motion for summary judgment must view all of the underlying facts in the light most favorable to the non-moving party, and must also give the non-moving party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Burke v. Beene*, 948 F.2d 489, 492 (8th Cir. 1991).

Under Rule 56(c), the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party is then required, under Rule 56(e), "to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id* at 324 (*citing* Fed. R. Civ. P. 56(e)). Establishing the existence of a genuine issue for trial requires that the non-movant "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The proof necessary to defeat a motion for summary judgment is "evidence from which a jury might return a verdict in [the non-movant'] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587.

III. **UNDISPUTED MATERIAL FACTS**

Defendant Nichole Francis is employed by the Iowa Department of Corrections as an Advanced Registered Nurse Practitioner at the Iowa Medical and Classification Center (IMCC) in Coralville, Iowa. Defendants' Statement of Undisputed Material Facts ¶ 1. At all times during Defendant Francis' employment with IDOC, she has held an Advanced Registered Nurse

Practitioner License issued by the Iowa Board of Nursing. *Id*. at ¶ 2. In order to fulfill her job responsibilities, Defendant Francis has access to inmate medical records, including those reported in the Iowa Corrections Offender Network medical database. *Id*. at ¶ 3. Additionally, Defendant Francis had some access to, and is familiar with, documentation used by private medical facilities for inmates who received treatment outside IDOC. *Id*.

Plaintiff Michael Lindsay (Offender # 6153064) was an inmate at IMCC for a period of time following his most recent parole revocation, from October 26, 2016, to February 18, 2020. *Id*. at ¶ 4. ICON records show that Plaintiff is currently on escape status, and a warrant has been requested.[1] *Id*. at ¶ 5. Defendant Francis reviewed the excerpts of Plaintiff's medical records, which are attached to Defendants' Motion for Summary Judgment as exhibits B through BC. *Id*. at ¶ 6. Defendant Francis also reviewed Plaintiff's allegations, as set forth in his Amended Complaint, and found no factual basis for his assertion that she or any other IDOC employee was deliberately indifferent to his diabetes, as further detailed below. *Id*. at ¶ 7.

Plaintiff's diabetes was noted in intake health screenings on October 26, 2018—his first day at IMCC following his parole revocation—and he was prescribed several medications on that same date for purposes of managing his blood sugar levels. Plaintiff was also allowed a diabetes-related modification to his diet, in the form of a health services snack. *Id*. ¶ 8. On the same date he arrived at IMCC, Plaintiff inquired about his insulin orders, and informed medical staff that he would sometimes wake up in the middle of the night and find his blood sugar "in the 40s." *Id*. at ¶ 9. At 3:15 a.m. during Plaintiff's first night at IMCC, he alerted medical staff that his blood sugar was low. He was given food in order to raise his blood sugar. *Id*. at ¶ 10. Before bed the

---

[1] Defendants mention this fact only because some support exists for the idea that this Court could dismiss this case by applying the Fugitive Disentitlement Doctrine. *See, e.g., Barnett v. Young Men's Christian Ass'n, Inc.*, 268 F.3d 614, 618 (8th Cir. 2001) (holding the doctrine can be applied to a civil case where the fugitive is the plaintiff, using the same factors set forth in *Degen v. United States*, 517 U.S. 820 (1996)).

next night, Plaintiff informed medical staff he didn't want to take his prescribed diabetes medication because he believed it had caused his low blood sugar the prior night. *Id*. at ¶ 11.

When Plaintiff was seen at IMCC Health Services on October 29, 2018, "his blood sugar was 383." *Id*. at ¶ 12. In response to Plaintiff's high blood sugar, Defendant Francis ordered that he be immediately given eight units of insulin as a one-time supplement to his existing medications. *Id*. at ¶ 13. The night after Plaintiff's blood sugar was 383 (mg/dl), Plaintiff was again seen by medical staff, this time at 1:20 a.m. *Id*. at ¶ 14. Plaintiff reported he had his blood sugar had felt low, and stated he had taken "all the glucose tabs in the container." *Id.* Plaintiff's blood sugar was checked, at his request, and found to be 64 (mg/dl). *Id*. Despite the fact Plaintiff stated he had already consumed a container of glucose tabs, he became upset with staff was given additional food as well. *Id*. at ¶ 15.

Later in the morning on October 30, 2018, Plaintiff was seen at the insulin pill line, where his blood sugar read 45 (ml/dl). *Id*. at ¶ 16. He was given food and a glucose gel tube, had his blood sugar re-checked twice, and was informed it was not a good idea to eat an entire tube of glucose tablets prior to having his blood sugar checked. *Id*. Plaintiff explained his understanding of his blood sugar fluctuation, stating "Yeah I tend to go up and down while they try to figure it out. I am usually high in the afternoon and then low in the morning." *Id*. at ¶ 17. Additional care was planned to help control Plaintiff's blood sugar, by way of a daily 2:00 a.m. blood sugar test. *Id*. Defendant Francis also conducted a chart review of Plaintiff's records on October 30, 2018. *Id*. at ¶ 18. Based on the information she had available regarding Plaintiff's fluctuating blood sugar, Defendant Francis asked the dietician to try to see him sooner rather than later, and discussed with her giving Plaintiff additional snacks and blood sugar checks. *Id.* Defendant Francis also gave additional medication orders and instructed that Plaintiff no longer be given medication at

5

night. *Id*. With respect to the administration of insulin, Defendant Francis ordered that he be given a sliding scale dose of insulin based on his blood sugar level at mealtimes. *Id*. at ¶ 19. However, she also instructed that he not be given the same sliding scale dosage based on his daily, 10:00 p.m. blood sugar checks, and that he instead receive a snack when less than 150 (mg/dl) before bed. *Id*.

Lab work was completed on November 1, 2018, at which time the treating physician again noted Plaintiff's diabetes was poorly controlled. *Id*. at ¶ 20. On November 2, 2018, Plaintiff's blood sugar was checked at 414 (mg/dl), and Plaintiff was again given a one-time order of twelve units of insulin in response. *Id*. at ¶ 21. Plaintiff's lab results from November 1, 2018 were reviewed on November 5, 2018, at which point the treating physician again noted Plaintiff's diabetes was poorly controlled, specifically noting "He has hypo as well as hyperglycemic events. These are not predictable/consistent as to the time of day." *Id*. at ¶ 22.

Prior to bedtime on November 5, 2018, Plaintiff's blood sugar was checked at 506 (mg/dl) by Defendant Stephanie Schmidt, LPN. *Id*. at ¶ 23. Defendant Schmidt appears to have noted Defendant Francis' prior changes to Plaintiff's sliding scale insulin order, which instructed that he not be given insulin at the bedtime blood sugar check. *Id*. As a result, Defendant Schmidt contacted the on-call physician for clarification on how to proceed. *Id*. The on-call physician ordered a one-time order of insulin (twelve units), similar to what Defendant Francis and other medical staff had done on prior occasions. *Id*. at ¶ 24. The physician also ordered a follow-up blood sugar test two hours later, and changed Plaintiff's insulin order back to a sliding scale order that included bedtime. *Id*.

In the early-morning hours of November 6, 2018, Plaintiff's cellmates alerted a unit officer that Plaintiff was seizing and unresponsive. *Id*. at ¶ 25. An emergency code was called, and

medical staff found Plaintiff lying on his lower bunk, where they assessed his vital signs and blood sugar. *Id*. In response to Plaintiff's hypoglycemic event, IMCC health care employees administered both glucose gel and glucagon injections. *Id*. at ¶ 26. A number of successive blood sugar tests between 2:47 and 3:09 a.m. showed a positive reaction to the treatment, as his blood sugar increased from a low of 40 mg/dl to a high of 131 mg/dl. *Id*. As his blood sugar rose, Plaintiff gradually returned to a more alert status. *Id*. Once Plaintiff was fully alert and aware of what had happened, he was instructed to stay in bed and wait for a nurse to check on him in an hour. *Id*. at ¶ 27. Plaintiff immediately disobeyed the instructions and walked outside his room, returning only when instructed to do so. *Id*. When a nurse came back an hour later to check on Plaintiff, he stated he felt better but explained he had disagreed with Defendant Schmidt's insulin dosage the prior night, stating "I thought that eight units would be better, but she thought [twelve] would be ok." *Id*. at ¶ 28.

IMCC Health Services medical personnel continued to provide treatment to Plaintiff during the week following his hypoglycemic episode. *Id*. at ¶ 29. Among the issues addressed were Plaintiff's complaints he injured his tongue, neck, elbow, left arm, and back during the episode. *Id*. The medical records also show continued attempts to control Plaintiff's diabetes with new and/or modified medication orders. *Id*. Then, in the early morning hours of November 13, 2018, Plaintiff again alerted medical staff he had low blood sugar, this time measured at 48 mg/dl (after he had eaten four glucose tablets). *Id*. at ¶ 30. He was given juice and snacks to raise his blood sugar, and reminded to let staff know of any new or worsening symptoms. *Id*. An IMCC physician met with Plaintiff later in the day on November 13, 2018. *Id*. at ¶ 31. He again modified Plaintiff's medication order in an attempt to control Plaintiff's diabetes, and also ordered an x-ray for Plaintiff's left elbow to rule out a fracture. *Id*.

The next day, November 14, 2018, Plaintiff's blood sugar had fluctuated again, this time reading 378 (mg/dl) just prior to bedtime. *Id*. at ¶ 32. A nurse reading Plaintiff's orders administered fourteen units of insulin based on existing sliding scale instructions, but another nurse realized there had been a transcription error in Plaintiff's care plan and ordered snacks to help stabilize his blood sugar. *Id*. The nurse who realized the error also ordered four blood sugar tests—one per hour for the next four hours—and Plaintiff was instructed to alert staff immediately if he felt like his blood sugar was low and needed checked. *Id*. During the subsequent interactions with Plaintiff later that night, he complained he had not wanted to take the amount of insulin given to him but had felt he had no choice other than to take it despite his objection. *Id*. at ¶ 33. He also asked questions about signing a release so that his family members and lawyer would have access to his medical records. *Id*. Between midnight and 3:35 a.m., Plaintiff's blood sugar stabilized between 113 (mg/dl) and 138 (mg/dl). *Id*.

The transcription error at issue was that the insulin order entered on November 6, 2018 had incorrectly listed a sliding scale order for 1, 2, 3, *14*, and 5 units instead of 1, 2, 3, 4, and 5 units. An email was sent scheduling a high priority review to correct the issue. *Id*. at ¶ 34. The error with Plaintiff's sliding scale insulin orders was corrected by 8:37 a.m. on November 15, 2018, approximately ten hours after the error was noticed by medical staff. *Id*. at ¶ 35. The error with Plaintiff's sliding scale insulin orders was also addressed in a chart review on November 15, 2018. *Id*. at ¶ 36.

Plaintiff was treated again for insulin-related issues on November 15, 2018. *Id*. at ¶ 37. Due to the ongoing issues controlling Plaintiff's blood sugar, a physician chart review was scheduled to clarify what kinds of snacks Plaintiff should be given to ensure his safety. *Id*.

8

Defendant Francis reviewed Plaintiff's charts on November 16, 2018. *Id*. at ¶ 38. In her notes, Defendant Francis stated

> [Patient] is an insulin dependent diabetic [for] who[m it] has proven difficult to achieve adequate control. [Patient] is very agreeable to interventions, [and] demonstrates active involvement in his education and treatment plan but seems to be very difficult to predict [regarding] how he will react with insulin doses and food consumption.

*Id*. Because of the unpredictable nature of Plaintiff's physical reactions to treatment, Defendant Francis referred him to an off-site endocrinologist at the University of Iowa Hospitals and Clinics (UIHC). *Id*. at ¶ 39. Defendant Francis believed Plaintiff might be an ideal candidate for continuous glucose monitoring and/or an insulin pump. *Id.* Defendant Francis also referred Plaintiff for immediate transport to the UIHC ER for another issue she noticed in his charts. *Id*. Plaintiff continued to receive treatment for his diabetes in the time period between my referral to UIHC Endocrinology and the date of his UIHC appointment. *Id*. at ¶ 40. This included treatment for another hypoglycemic incident on November 27, 2018, when Plaintiff's blood sugar was recorded at 34 mg/dl. *Id*.

Plaintiff was seen by UIHC Endocrinology on November 28, 2018. *Id*. at ¶ 41. The treatment plan recommended by the UIHC specialists involved a change in Plaintiff's medication order, in conjunction with no bedtime insulin, "to help with overnight lows." *Id*. Defendant Francis reviewed the UIHC records on November 29, 2018. *Id*. at ¶ 42. She noted the recommended changes to Plaintiff's medication orders and care plan, and had Plaintiff moved to the Long Term Ambulatory unit so that his treatment could be monitored more closely. *Id.* Defendant Francis also scheduled Plaintiff a three-month follow up appointment at UIHC. *Id.*

In following weeks and months, Defendant Francis worked to ensure the UIHC recommendations were being followed, and even had additional conversations with UIHC medical

staff in order to adjust and fine-tune the changes to Plaintiff's medication orders and treatment plan. *Id*. at ¶ 43. When Defendant Francis met with Plaintiff on January 25, 2019, he seemed happy and commented that his recent blood sugar numbers were "pretty good." *Id*. at ¶ 44. Plaintiff also continued to receive regular treatment for his diabetes from other IMCC medical staff members following his visit to UIHC Endocrinology. *Id*. at ¶ 45. In fact, care for Plaintiff's treatment was guided by the recommendations given by UIHC specialists beginning on November 29, 2018, until Plaintiff was released from IMCC on February 18, 2020. *Id*. at ¶ 46. Plaintiff was specifically informed of this fact on December 7, 2018, during a discussion regarding grievances he had filed complaining about the diabetes treatment he had received at IMCC. *Id*.

Defendant Francis believes, based on her training and experience, that she and other staff at IMCC provided appropriate treatment in response to Plaintiff's diabetes-related medical complaints. *Id*. at ¶ 47). She believes that any errors or mistakes made by any member of the IMCC medical staff were unintentional, and are attributable to the difficulty of managing Plaintiff's blood sugar and the fact that Plaintiff's medication orders were adjusted frequently, by multiple staff members, in an effort to control his diabetes. *Id*. Defendant Francis further believes Plaintiff received appropriate care from staff at UIHC. *Id*. at ¶ 48. This is notable because it was UIHC medical staff, not IMCC medical staff, who directed Plaintiff's medical care beginning on November 28, 2018. *Id*.

Defendants Daniel Forbes and Franklin Selden had no personal involvement in the medical care provided by staff at IMCC. *Id*. at ¶ 49. Moreover, Defendants Forbes and Selden are not employees who serve any medical functions at all; their only apparent involvement in the events at issue in this case is the fact they responded to the emergency code sent out when Plaintiff had his hypoglycemic event in the early-morning hours on November 6, 2018. *Id*.

## IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY WERE NOT DELIBERATELY INDIFFERENT TO PLAINTIFF'S SERIOUS MEDICAL NEEDS

The law governing medical actions brought by inmates pursuant to 42 U.S.C. § 1983 is well-established. Such actions are based in the Eighth Amendment, as applied to the states through the Fourteenth Amendment, since "[t]he Eighth Amendment's proscription of cruel and unusual punishment obligates prison officials to provide inmates with medical care." *Dulaney v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (*citing Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "To prevail on an Eighth Amendment claim of constitutionally inadequate medical care, the inmate must show that the prison officials' conduct amounted to 'deliberate indifference to [the prisoner's] serious medical needs.'" *Id.* (alteration in original).

Proving deliberate indifference to a serious medical need requires showings of both an objective and a subjective component. *Id.* at 1239. An inmate "must demonstrate (1) that they suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs. *Id.* (*citing Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)); *see also Corwin v. City of Independence, MO*, 829 F.3d 695, 698 (8th Cir. 2016). Deliberate indifference to serious medical needs equates to "the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 105 (*citing Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Thus, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106.

Furthermore, an inmate's disagreement over the proper course of treatment does not implicate the Eighth Amendment. *See Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990); *Givens v. Jones*, 900 F.2d 1229, 1233 (8th Cir. 1990). Because "[p]risoners do not have a

constitutional right to any particular type of treatment," "[p]rison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement the prisoner's requested course of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) (citations omitted). This makes sense, given that "society does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Plaintiff claims Defendants, collectively, were deliberately indifferent to his serious medical needs based on his own assessment that he received substandard medical care for his diabetes. However, despite his complaints, Plaintiff cannot show that any Defendant was deliberately indifferent to his serious medical needs. All IMCC medical staff—Defendants Francis and Schmidt included—provided adequate and appropriate care, and the Court should grant Defendants summary judgment.

### A. DEFENDANTS FRANCIS AND SCHMIDT

The most Plaintiff could possibly prove in this case is that Defendants Francis and Schmidt, or other IMCC medical staff, were negligent in failing to control his diabetes more quickly; he cannot provide any evidence showing anyone consciously disregarded his need for treatment. To the contrary, the record is replete with documentation showing that Defendants Francis, Schmidt, and other medical personnel at IMCC took Plaintiff's medical needs seriously and endeavored to provide an appropriate course of medical treatment. When IMCC medical staff realized they were unable to adequately control Plaintiff's diabetes on their own, because his medical needs exceeded the capabilities of IMCC Health Services, Defendant Francis referred Plaintiff to UIHC for treatment by specialists.

The medical records do not show that Plaintiff was ignored or that his treatment was purposely delayed by any Defendant. The worst that can be said of Defendant Schmidt is that she

followed the on-call physician's order to give Plaintiff twelve units of insulin. It is hard to discern a single action taken by Defendant Francis with which Plaintiff might reasonably take issue. Because Plaintiff cannot provide any evidence showing Defendants Francis or Schmidt exhibited deliberate indifference to his medical needs, they are entitled to summary judgment in their favor.

### B. DEFENDANTS FORBES AND SELDEN

Plaintiff's only specifically-articulated claim against Defendants Forbes and Selden is his allegation "[t]hey are said upon information and belief to have been laughing and joking that the plaintiff was 'dead' and that 'he didn't make it.'" *See* Plaintiff's Amended Complaint at ¶ IV(f). However, even assuming Plaintiff is correct (a point Defendants do not concede), whatever insensitive comments they made would still not make any difference in this case, as neither Forbes nor Selden had any personal involvement in the medical care provided to Plaintiff by IMCC medical staff. In fact, neither Forbes nor Selden are employees who serve a medical function at all. Thus, Defendants Forbes and Selden are entitled to summary judgment in their favor. *See, e.g., Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) (discussing the underlying premise that liability under 42 U.S.C. § 1983 for constitutionally-deficient medical care necessarily requires direct responsibility for the inmate's medical care).

### V. ALTERNATIVELY, DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S DELIBERATE INDIFFERENCE CLAIMS

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009), (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they

perform their duties reasonably." *Id.* The protections of qualified immunity exist regardless of whether the government official's error is a mistake of fact or law or a mistake of mixed questions of both. *Id.* Moreover, because qualified immunity represents an immunity from suit rather than a defense to liability, "it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)).

Prior to *Pearson,* qualified immunity analysis required a two-step inquiry. First, a court had to determine whether a constitutional right was violated; second, if the court found a constitutional violation, it then had to determine whether the right violated was "clearly established." *Saucier v. Katz,* 533 U.S. 194, 201 (2001). In *Pearson*, the Supreme Court declared the two-step protocol set forth in *Saucier* "should no longer be regarded as mandatory," so a court may use its own judgment and consider either of the two steps first. *Pearson*, 555 U.S. at 236. Thus, a court may now address the second step of the inquiry—whether any clearly established constitutional right is implicated—without having to first resolve the question of whether the alleged constitutional violation occurred. Whether the right in question was clearly established is a particularized inquiry—"[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 202 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall,* 375 F.3d 703, 712 (8th Cir. 2004) (quoting *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992)). In other words, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

Given the undisputed facts of this case, Defendants are entitled to qualified immunity on Plaintiff's claims of deliberate indifference. Even if the Court were to determine that any of

Defendants' actions towards Plaintiff amount to an Eighth Amendment violation, no reasonable medical professional would have believed that Defendants' treatment of Plaintiff's diabetes would amount to a constitutional violation. Plaintiff's diabetes was consistently addressed from the day he entered IMCC following his parole revocation, and when control of his blood sugar proved difficult, Plaintiff was referred to specialists at UIHC, who directed his care from that point on. Plaintiff's medical issues were never ignored. Because Defendants did not violate Plaintiff's clearly-established constitutional rights, Defendants are entitled to qualified immunity.

## VI. CONCLUSION

Based upon the foregoing authority and factual record, Defendants' motion for summary judgment should be granted.

Respectfully submitted,

THOMAS J. MILLER
Attorney General of Iowa

 /s/ NICHOLAS E. SIEFERT
NICHOLAS E. SIEFERT (AT0012993)
Assistant Attorney General
Special Litigation Division
Hoover Office Building
Des Moines, IA 50319
Telephone: (515) 281-6665
Fax: (515) 281-4902
Email: nick.siefert@ag.iowa.gov
ATTORNEY FOR DEFENDANTS
FRANCIS, SCHMIDT, FORBES and SELDEN

Original filed.

Copy to:

Michael Lindsay
Inmate #6153064
Dubuque Residential Facility
1494 Elm Street
Dubuque, IA 52001

**Proof of Service**
The undersigned certifies that the foregoing instrument was served upon each of the persons identified as receiving a copy by delivery in the following manner on October 1, 2020.

x U.S. Mail  ☐ FAX
☐ Hand Delivery  ☐ Overnight Courier
☐ Federal Express  ☐ Other
☐ Electronically

Signature:   /s/ JESSICA R. PORTER